LEWIS *versus* GOGUETTE.

1. The act of 1812,[a] on the subject of certificates, issued under any acts of Congress, &c. was intended to embrace, and equally applies, to all certificates that had been, or might have been, legally granted, pursuant to acts of Congress, then existing; or which might afterwards have been passed, granting "certificates upon any warrant; or order of survey, or to any donation or pre-emption claimants."

2. So, this statute embraces a certificate, issued under the act of Congress of 1822, entitled "and act confirming claims to lots in the town of Mobile, and to lands in the former province of West Florida, which claims have been reported favorably on by the commissioners appointed by the United States."

3. A certificate of confirmation, issued under this act of Congress, would, however, not be conclusive against adverse claims, also, importing legal titles; and any fraud, imposition or illegality in procuring such certificate, would be open to exposure, by the party aggrieved: but where such certificate is opposed by no title, or by nothing more than a recent possession, though held under a claim or assertion of right; or even under a long continued possession, the benefit of which had been forfeited, by the failure of the occupant to interpose his claim, within the time limited for ascertaining and adjusting imperfect titles;—it cannot be doubted that the preference is due to the certificate of confirmation.

4. Such certificate of confirmation, in the absence of an adverse title, or right of possession, will give the holder thereof a right of possession; and authorise a recovery in the action of trespass to try title.

5. In the action of trespass to try title, it is not indispensable that the plaintiff should show a perfect indefeasable estate, in *fee simple*, to authorise a recovery against one who can establish no legal right, either of property or possession.

6. Evidence of a sheriff's deed, made under a sale by the sheriff, it not appearing that any judgment had been rendered, is not admissible.

This was an action of trespass to try title, commenced by the defendant in error, in Mobile Circuit

---

[a] See Aikin's Digest, page 283, §142.

court, to recover possession of a lot of land, situated in the town of Mobile.   A verdict and judgment being had in favor of the plaintiff; Lewis, on exceptions, brought the case into this court.   The plaintiff, in support of her title, and right to possession, produced in evidence, a certificate of confirmation, issued by the land office, for that district, under the act of Congress of the 8th May, 1822. dated the 4th November, 1822; and which showed said claim to have been founded on a Spanish order of survey, of May, 1800 : also, a transcript, copied from the records of the land office, consisting of the said order of survey, and the grant thereon by the Spanish commandant; and the notice of claim : the transcript also disclosed a recognition of the claim of the plaintiff below, to the lot in controversy, by the commissioner under the act of Congress.

The defendant offered to show in proof, by certain copies of a record, a title in himself, to the lot, under a sheriff's deed, on a sale; which purported to have been made under certain proceedings of the superior court of Mobile county ; but the court refused to admit evidence of such records, it not appearing that there had been any judgment entered up, thereon ; and instructed the jury that the certificate of confirmation was a sufficient evidence, of legal title, to sustain a recovery.

The defendant here assigned for error—first, the decision of the court, ruling the certificate sufficient evidence of title to authorise a verdict ; second, the rejection of the evidence offered by the defendant below.

*Hitchcock*, for plaintiff—*Acre, contra.*

SAFFOLD, J.—The action was trespass to try titles to a lot in the town of Mobile, brought by the defendant in error, against the present plaintiff, in which a recovery was had in the court below, of the premises in controversy, and damages pursuant to statute; and from which the defendant below prosecutes this writ of error.

The questions presented for revision arise entirely out of a bill of exceptions, taken on the trial in the Circuit Court.

The exceptions are—That the plaintiff below gave in evidence, a certificate of confirmation, issued from the land office of the proper district, for the premises in her declaration mentioned; which bears date the 4th of November, 1822, and is in the usual form of such certificates, issued pursuant to the act of Congress of the 8th May, 1822, entitled, "An act confirming claims to lots in the town of Mobile," &c., and declaring said claim to have been founded on a Spanish order of survey, granted by Cayetone Perez, (who is understood to have been Spanish commandant,) dated May, 1800. She also gave in evidence what is called "a transcript, proved to have been copied from the records of the same land office, of her claim, whereon her said certificate is alleged to have been founded." This consists of her notice of claim, to the commissioner of land claims, east of Pearl river, stating it to have arisen by virtue of a permit, or order of survey, from the Spanish government; accompanying which is her petition to Perez, the Spanish commandant, for the same lot, bearing date 23d May, 1800, together with his grant of the same; and order for its survey, of the same date. The transcript also contains, in the usual form,

an extract from the report of the commissioner to the general land office, entitled a "register of claims to land in the district east of Pearl river, in Louisiana, founded on orders of survey, (requettes,) permissions to settle, or other written evidences of claim, derived from either the French, British or Spanish authorities, which, in the opinion of the commissioner ought to be confirmed;" and which transcript recognizes her claim as being of the nature of that already described, and with reference to both the claim and report of the commissioner thereon, is certified to be correctly copied from the books of the land office, by the register and receiver thereof. She further proved the defendant in possession of the premises and closed her evidence.

On this proof. Lewis moved the court to instruct the jury, that her title was not sufficient to enable her to recover; but the court refused the instruction; and on the contrary, instructed the jury that the evidence so offered, did amount to a legal title, sufficient to enable the plaintiff to recover, if they should find the defendant in possession.

Then the defendant also offered in evidence, a register of a deed, admitted to record in the County court of Mobile county, which purported to be the transcript of a deed for the lot in question, from the plaintiff to one Ortez, executed at Pensacola, on the 3d November, 1815, before the Spanish authorities of West Florida, to prove that the plaintiff had sold the premises before the commencement of this suit. To the introduction of this evidence the plaintiff objected, because the said register was the copy of a copy, only, purporting to be of a deed executed in Pensacola, beyond the jurisdiction of this State, in

the year 1815, and not under seal. The court sustained the objection, and instructed the jury that the deed did not bar the plaintiff's right of recovery; it conveying no legal estate out of her, and being dated anterior to the certificate of confirmation, granted in her name.

The defendant further offered in evidence, the record of proceedings in the late superior court of Mobile county, to shew that he was a purchaser, under a sale, by the sheriff of the said county; but the court refused to permit the record to be read as evidence, on the ground that it did not appear that any judgment had been entered up, on the verdict of the jury, and that the execution, if any had been issued, and the sale thereon, if any were made, were void, and were not founded on any suit against the plaintiff. To which the plaintiff excepted.

The exception, however, respecting the admissibility and legal effect of the deed to Ortez, with the view to establish an outstanding title, is understood to have been abandoned by the plaintiff in error.

1. The other exceptions, on which alone, Lewis relies and assigns error, are, first, that the court below instructed the jury, that the certificate from the land office, was a sufficient legal title to sustain a recovery.

2. That the record of proceedings of the late superior court of Mobile county, and the sheriff's deed, were improperly excluded from the jury.

1. With respect to the certificate of confirmation, reference is made in argument, by each party, to the statute of December, 1812,[a] entitled an " act making further regulations in judicial proceedings," which provides, " that all certificates issued in pursuance of

aToul.Dig. 248

any act of congress, by any of the boards of commissioners, registers of the land office, or any other person, duly authorised to issue such certificates, upon any warrant or order of survey," &c. " for any lands in this territory, shall be taken and received, as vesting a full, complete and legal title in the person, in whose favor the said certificate is granted, to the lands therein mentioned, and his, her, or their heirs, so far as to enable the holder of such certificate to maintain any action thereon; and the same shall be received in evidence, as such," &c.

It is objected, that this statute does not apply to certificates, such as this: that the act of congress, under which it issued, is subsequent to said statute: that this statute had reference to certificates issued pursuant to the earlier acts of congress, which provided for judicial investigations into the legality of the claims; without which, the legislature had no constitutional right to recognise the certificates as evidence of legal title. On the contrary, it is insisted, the statute does apply, and is decisive of the question made by the assignment—and has been so held, by previous decisions of this court. That, this act, formerly the law of the Mississippi territory, was adopted as the law of the State, in January, 1823; and, that the act of congress under which the certificate issued, was in the contemplation of the legislature, when they adopted the act in question.

The statute of 1812, alluded to, was passed by the general assembly of the Mississippi territory, previous to its division, and the consequent establishment of the Alabama territory; and also, to the adoption of our state government. By the constitution of this State, adopted, in 1819, it was declared, "that

all, laws and parts of laws then in force, in Alabama territory, (which included, equally, those passed by the Mississippi legislature, prior to the division,) which were not repugnant to the provisions of the constitution, should remain in force as the laws of this State, until they should expire, or be altered, or repealed by the legislature thereof. Afterwards, in 1823, the statute in question was incorporated with all others in force, into our code, entitled, "laws of Alabama." I conceive, however, that the date of this statute has relation to the time of its original passage, in 1812, as though there had been no change of government, or new compilation of the statutes—yet, that this concession is not decisive of the question.

It is true, there is an act of congress, of the third March, 1803, "regulating the grants of lands, and providing for the disposal of the lands of the United States, south of the State of Tennessee;" and, another, "supplementary" thereto, passed in 1804, which created land offices, east and west of Pearl river, with registers and receivers to each; and established boards of commissioners, including the registers and receivers, with authority to investigate and confirm certain land claims therein provided for, and to give certificates, which should amount to relinquishments forever, on the part of the United States: in other cases, they were required to make full reports to the secretary of the treasury, to be, by him, laid before congress, for their final decision.

I think it a just interpretation of the statute of 1812, that it was intended to embrace, and must equally apply to, all certificates that had been, or might be legally granted, pursuant to acts of congress then ex-

isting, or which might afterwards be passed, authorising certificates of the grade and dignity contemplated—that is, to all "certificates, upon any warrant or order of survey, or to any donation or pre-emption claimants." I should greatly hesitate, to allow to certificates of the same dignity, because granted under previous acts of congress, more weight, as evidence of title, than if given under subsequent acts, *in pari materia.* The language of the statute does not limit its application to certificates issued pursuant to acts of congress then existing, or, by boards of commissioners, or other officers, previously created or appointed. Its terms are general, applying to *"all certificates* issued in pursuance of *any act of congress,* by any of the boards of commissioners; registers of the land office, or any other person, duly authorised to issue such certificate, upon *any warrant, or order of survey."*

It is also worthy of notice, that the act of congress, contributing most materially to the recognition of this claim, bears date anterior to the passage of the Alabama statute. The act of .congress, entitled, " an act for ascertaining the titles and claims to lands in that part of Louisiana, which lies east of the river Mississippi, and island of New Orleans," was passed on the 25th April, 1812[a]—our statute, in December, of the same year. It may correctly be said, that this certificate did not issue pursuant to the act of congress of 1812; nor did it authorise the issuance of any—that it was under one passed in 1822. This is admitted—and, if the date of the act be the true criterion—is fatal to the certificate; but, it will be seen, that various acts of congress, including all referred to, and some others to be noticed, are essential-

[a] L. L. 606.

ly *in pari materia.*—That the latest can have no force or operation, without reference to the former, not only for construction, but for directions and materials, on which to act—that the certificates, authorised by the subsequent acts, emanate from an equal source, are of the same dignity, and are entitled to the same legal effect.

The act of congress of 1812, having been quoted and reviewed at considerable length, in the case of *Hallet* vs. *heirs of Eslava,*a in a decision of the present term, I will content myself with a reference thereto, and a more brief notice of it, in this.     It created land districts east and west of Pearl river, and authorised the appointment of a commissioner and clerk to each, with powers and duties similar, in many respects, to those which had previously been confided to the boards of commissioners, and clerks of the land offices, then existing.     It directed all claimants of lands, by virtue of any grant, order of survey, or other evidence of claim, derived from either the French, British or Spanish governments, to lay their claims before the commissioners, with notices thereof, and that the same should be recorded; else, they should not be recognised.     It also required the commissioners, according to instructions from the secretary of the treasury, "to prepare, or cause to be prepared, abstracts from the records of the claims filed as aforesaid;" which abstracts shall contain the substance of the evidence adduced in support of, or obtained respecting the claims," &c.; and this the commissioners shall respectively "report to the secretary of the treasury, and shall, by him, be laid before congress, for their determination thereon."     To enable these commissioners de decide with more justice and accuracy,

a Page 105, of this vol.

they were authorised " to administer oaths, and to compel the attendance of, and examine witnesses, and such other testimony as might be adduced—to have access to all records of a public nature, relative to the granting, sale, transfer, or titles of land, within their respective districts;" and to take transcripts from the same, and cause entries thereof to be made.

The act of congress of 1819,[a] " for adjusting claims to lands, and establishing land offices, in the district east of the island of Orleans," declared, that all claims founded on complete Spanish grants, a certain description of British grants, or, on "any order of survey, requette, permission to settle, or any written evidence of claim, derived from the Spanish authorities, before the 20th December, 1803 ;" and where the land so claimed had been cultivated and inhabited before that day ; and which claims were reported to the secretary of the treasury, by the commissioners of the districts east and west of Pearl river, under the said act of 1812; and which claims were, in the opinion of the commissioners, valid, should be, and were, thereby, declared valid and complete titles, against any claim of the United States, or right derived therefrom. It also, established the land offices, at St. Helena court house, and at Jackson court house, and authorised the appointment of a register and receiver thereof, with power to appoint a clerk—and, transferred to them the duties previously required of the commissioners of the districts east and west of Pearl river, and directed the appointment of a surveyor therein. It further directed, that the books of the former commissioners, in which the claims and

[a] L. L. 758.

evidences of claims were recorded, should be lodged with the register of the land office, for the respective districts; and that the registers and receivers should have power to examine the claims recognised, confirmed, or provided to be granted, by the provisions of this act; as, also, claims to the right of pre-emption : and, that they should make out to each claimant, entitled, in their opinion, thereto, a certificate, according to the nature of the case, under such instructions as they might receive from the commissioner of the general land office; and, on presentation, at the general land office, of such certificate for a confirmed claim, or for a donation, according to the provisions of this act—and, where it should appear, to the satisfaction of the commissioner of the general land office, that the certificate had been fairly obtained—then, and in that case, a patent should be granted, in like manner, as for other lands of the United States.

*L. L. 823.*    An act of congress, of the 8th May, 1822,[a] "supplementary to the several acts for adjusting the claims to land, and establishing land offices, in the district east of the island of New Orleans," bears a strong affinity to the other, of the same date, under which this patent purports to have issued; and, embraces, substantially, the rights contemplated by it. This applies, more particularly, to larger tracts of land, whilst the other refers exclusively to lots in the town of Mobile; but this, as far as its provisions are appropriate, is equally applicable to town lots.— Among other provisions, it authorises, the registers and receivers of the land offices, east and west of Pearl river, to issue certificates for all lands, confirmed by virtue of the provisions of that act, in the

same manner as certificates are granted for lands,
confirmed under former acts, to which this is a sup-
plement.

The other act, of the 8th May, 1822,[a] " confirm-[b]L. L. 819.
ing claims to lots in the town of Mobile, and to lands
in the former province of West Florida, which claims
have been reported favorably on, by the commission-
ers appointed by the United States," under which
this certificate purports to have issued, provides, (sec-
tions 1 and 2,) that all claims to lots in the town of
Mobile, founded on complete French, Spanish or Bri-
tish grants; or, on orders of survey, requettes, per-
missions to settle, or other written evidences of claim;
derived from the French, British or Spanish authori-
ties, bearing date prior to the 20th December, 1803;
reported to the secretary of the treasury, by the com-
missioner of the district east of Pearl river—under
the authority of the before recited act, of 1812; or
which were so reported by the register and receiver,
acting as commissioners, under the before recited act,
of Macrh, 1819, " and which ought, in the opinion
of the commissioner, to be confirmed, shall be con-
firmed, in the same manner, as if the title had
been completed." The conclusion of the fourth
section declares, that all confirmations and grants
provided to be made by this act, shall amount
only to a relinquishmentnt forever, on the part
of the United States, of all right and title, whatever,
to the lots of land so confirmed or granted. The
fifth section confers on the register and receiver, pow-
er to direct the manner in which all lands confirmed
by this act, (and town lots only are mentioned,) shall
be located; and, also, to decide between the parties,
in all conflicting and interfering claims, according to

similar authority, in other acts, and according to the circumstances of the case, and the principles of justice. From this review of the several acts of Congress, it appears that the objection respecting the constitutionality of the State statute of 1812, recognizing such certificates as valid and legal evidence of title, would apply no less to certificates issued pursuant to the acts of Congress of 1803 and 1804, than to such as are authorised under the acts of 1819 and 1822 ; *that investigations on the oath of witnesses and other competent evidence, are equally contemplated by them all;* that certificates legally issued, pursuant to the latter acts, are no less evidence of the right than those under the former ; and, therefore, the reason and equity of our statute, must apply equally to the different certificates, issued under the authority of the United States; and which, according to the laws thereof, entitle the holders to patents. Nevertheless, the courts of justice are open to all persons aggrieved, and to which they can resort, to expose and detect any fraud, imposition, or illegality, in procuring such certificate, whereby the constitutional right of trial by jury is preserved.

I would not be understood to maintain that such certificate is conclusive against adverse claims, also importing legal titles; but when opposed by no title, or nothing more than a recent possession, though held under a claim or assertion of right; or even a long-continued possession, the benefit of which has been forfeited, by the failure of the occupant to interpose his claim within the time limited for ascertaining and adjusting the imperfect titles; I can not doubt that a decisive preference is due to the certificate of confirmation. Such has been the decision

LEWIS *vs.* GOGUETTE.

of this court in the previous cases referred to, of *Richardson* vs. *Hobert,*[a] and *Hallet* vs. *Eslava*[b]—*see the latter case again decided at the present term.*

[a] 1 Stew 500
[b] 2 Id. 115.
[c] Page 105 of this vol.

The certificate of confirmation, in the absence of any adverse title, or right of possession, must at least give the holder a right of possession; and that is sufficient to warrant a recovery in a possessory action, as this is. It is true that in ejectment, for which this action is substituted, the plaintiff can only recover on the strength of his own title, not on the weakness of his adversary's; yet it is not indispensable that he should show a perfect indefeasable estate in *fee simple*, to authorise a recovery against one who can establish no legal right, either of property or possession; even a leasehold estate is sufficient for a recovery under such circumstances—*Vide White* vs. *St. Guerons.*[d] But this title is much better; it imports a legal claim to a patent, which is the highest evidence of a perfect indefeasable estate under our government, and which government, at least, whilst no adverse title appears, had an undoubted right to recognize and legalize this claim, as it has done.

[d] Ala.R.331

The case of *La Croix* vs. *Chamberlain,*[e] relied on by each party, is conceived to sanction the positions above advanced; also, the application of our statute of 1812, to a case like this. That was ejectment, in the District court of the United States for Alabama. The plaintiff claimed the land as devisee of one Collell, and offered in evidence, as the first link in his chain of title, a *concession* from the Spanish government to said Collell. The District court decided, that the concession, being no higher evidence than a warrant, or order of survey, would not support ejectment. Error having been prosecuted to the Su-

[e] 12 Wheat. 599.

preme Court, the opinion of that court was delivered by *Justice Trimble.* He admitted the obligation of the United States, according to the terms of the treaty of cession, by which they acquired the Floridas, to confirm such concessions as had been made by warrants of survey; yet said it would not follow that the legal title would be perfected until confirmation; he maintained that the legal title remained in the United States, until, by some act of confirmation, it was passed, or relinguished to the claimants; that the government had maintained its right to prescribe the forms and manner of proceeding in order to obtain a confirmation, and its right to establish tribunals to investigate and pronounce upon their fairness and validity; that this was demonstrated by the laws which congress had repeatedly passed, establishing boards of commissioners to investigate the claims, and to reject or confirm them, or report them to Congress, in cases of doubt; also, by the act of congress requiring all such claims to be recorded within prescribed periods: and he farther said that claims, concerning which these requisites have not been complied with, can derive no aid from the laws of the United States. He also referred to the Alabama statute of 1812, and said that case was not brought within its provisions; for it did not appear that any such certificate as it contemplated had been issued on that claim. Under these views, the judgment of the District court was affirmed. From the language of the court, it may fairly be inferred, that had the claimant procured a confirmation of his title, according to the laws of congress, and obtained a certificate thereof, the same would have been regarded as a legal title.

But, it is argued, in opposition to this title, that, if the holder of such certificate can avail himself of it, as evidence of legal title, it is unnecessary to present it at the general land office, for a patent; and, if his claim be defective, will not do so; and, that he can thereby, avoid defeat. I consider it a sufficient answer to this objection, as already remarked, that the certificate may be evidence of a legal title, without being paramount to all other.—That, though it be sufficient to warrant a recovery, against one who can oppose no title to it: yet, if it can be shewn to have been illegally obtained; or, if the adversary can produce a better title (or, when defendant, one tantamount,) the case would be materially changed.

It is probable, that any defect in the title, under a certificate, which would deter the holder from presenting it for a patent, or defeat his claim, if presented, would equally invalidate it, when legally disclosed, in a court of justice. But, until the contrary be shewn, the presumption is, that a patent should, and will issue, as indicated by the certificate. Yet, if the fact be, as suggested in argument, that a *caveat* has been entered against it, in the general land office, and the issuance of the patent has been delayed, to abide the result of a judicial decision; and, on this trial, no legal objection has been shewn against the holder's right to a patent—this circumstance can not affect the legality of the title, under the certificate.

2. The other assignment is, that the record of proceedings of the late Superior court of Mobile county, and the sheriff's deed, were improperly excluded from the jury.

This point is thought to require less consideration. Indeed, the counsel, making it, evinced but little con-

fidence in it.    The record was offered to show, that
Hallet was a purchaser, under a sale by the sheriff of
the county ; but the court refused to permit it to be
read as evidence, on the ground, that it did not ap-
pear, that any judgment had been entered, upon the
verdict ; and, that the execution, if any, had issued;
and, the sale thereon, if any were made, were
void—and were not founded on any suit against the
plaintiff.    The want of a judgment is admitted to
have been a defect in the proceedings ; but, it is sug-
gested, that it was not the practice of that court, at
that day, to enter up judgments in form : therefore,
the failure should not prejudice the party, claiming
under it.    If I could assume the fact to be as stated,
yet there does not appear any thing in the nature of
a judgment; and, I recognise no authority in this
court to vary the rules of evidence, so as to make
them subservient to irregular modes of practice, in
other tribunals.    The law is understood to have re-
quired the actual rendition of judgments, then, as
now.

But the more decisive objection to the evidence, is,
that the suit was againt a stranger—one who does
not appear to have had the slightest pretence or color of
title, to the lot in contest: nor is it shewn that any
was attempted to be proved.

I am of opinion, that the judgment must be af-
firmed.


TAYLOR, J.—I shall notice but one of the several
points which have been made in this case, being sa-
tisfied with the opinion of my brother, *Saffold,* on all
others.    The one, on which I differ with him, is the
effect of the certificate issued by the register and re-

ceiver of the land office, at Jackson court house, un-
der the act of congress, passed in 1822, entitled, "an
act confirming claims to lots in the town of Mobile,
and to land in the former province of West Florida,
which claims have been reported favorably on, by
the commissioners, appointed by the United States."

The question to be decided, is, whether or not the
eighth section of the act passed by the legislature of the
Mississippi territory, in 1812, and which is retained
in our code, is applicable to certificates issued by
virtue of the act of congress, of 1822, above refer-
red to.    That section is in the following words:—
" That all certificates issued in pursuance of any act
of congress, by any of the boards of commissioners,
register of a land office, or any other person, duly
authorised to issue such certificate, upon any war-
rant or order of survey, or to any donation or pre-
emption claimants, for any lands in this territo-
ry, shall be taken and received, as vesting a full,
complete and legal title in the person, in whose fa-
vor the said certificate is granted, to the lands there-
in mentioned, and his, her or their assigns, so far as
to enable the holder of such certificate to maintain
any action thereon; and the same shall be received
in evidence, as such, in any court of this territory."

To arrive at a correct conclusion, with respect to
the intention of the legistature, in enacting the above
section, it is necessary to ascertain what kind of cer-
tificates, the acts of congress, which had been pre-
viously passed, authorised, " any of the boards of
commissioners, register of a land office," &c. to is-
sue : for, it cannot be supposed, that the section in-
tended to embrace any and every kind of certificate,

which any subsequent acts of congress might empower such officers to issue, although totally dissimilar from those authorised by preceding acts, in their object and intention.

In 1803, congress passed an act, entitled, " an act regulating the grants of land, and providing for the disposal of the lands of the United States, south of the State of Tennessee."

By the first section of that act, " any person or persons, and the legal representative of any person or persons, who were resident in the Mississippi territory, on the twenty-seventh day of October, in the year one thousand seven hundred and ninety-five, and who had, prior to that day, obtained, either from the British government of West Florida, or from the Spanish government, any warrant, or order of survey, for lands lying in the said territory," &c. "shall be confirmed in their claims to such lands, in the same manner as if their titles had been completed."

" Section 2, To every person," &c. " who being either the head of a family, or of twenty-one years of age, did, on that day, of the year seventeen hundred and ninety-seven, when the Mississippi territory was finally evacuated by the Spanish troops, actually inhabit and cultivate a tract of land in the said territory, not claimed, by virtue, either of the preceding section, or of any British grant, or of the articles of agreement and cession between the United States and the State of Georgia, the said tract of land, thus inhabited and cultivated, shall be granted."

The third section gives a right of pre-emption to residents, at the time the act passed, of lands, not claimed by grant, or under either of the preceding sections.

The act then provides for the establishment of a land office, east, and one west of Pearl river; the appointment of a register and receiver for each office : that, persons claiming lands by virtue of British grants, or the three first sections of the act, &c. should, before the first March, 1804, deliver to the register, notices of their claims, &c.

The sixth section provides, that two persons should be added to the register of each land office, who should constitute " commissioners, for the purpose of ascertaining the rights of persons, claiming the benefit of the articles of agreement and cession between the United States and the State of Georgia, or of the three first sections of this act;" that they shall take an oath, impartially to discharge their duties, &c. "And each board, or a majority of each board, shall, in their respective districts, have power to hear, and decide, in a summary manner, all matters respecting such claims ; also, to administer oaths and examine witnesses, and such other testimony as may be adduced ; and to determine thereon, according to justice and equity," &c. Then follow these words : "And when it shall appear to them, that the claimant is entitled to a tract of land, under the articles of agreement and cession with Georgia, aforesaid, in virtue of a British or Spanish grant, legally and fully executed, they shall give a certificate thereof, describing the tract of land and the grant, and stating that the claimant is confirmed in his title thereto, &c.; and when it shall appear to the said commissioners, that the claimant is entitled to a tract of land, by virtue of a settlement, under the Bourbon act of Georgia, or of either of the two first sections of this act, they shall give a certificate there-

of, stating the circumstances of the case ; and that the claimant is entitled to receive a patent for such a tract of land, by virtue of this act : which certificate being duly entered with the register of the land office, on or before the first day of January, eighteen hundred and five, shall entitle the party to a patent for said tract."

The statute proceeds to provide the mode, by which, those entitled to pre-emptions shall proceed to obtain certificates ; after which, the 6th section terminates with the following proviso : " *Provided, also, and it is further enacted,* That whenever a tract of land, to which any person might be entitled, by virtue of the three first sections of this act, shall also be claimed by the holder of a British patent, legally and fully executed, and duly recorded, in conformity to the provisions of this act, who is not confirmed in his claim by the articles of agreement above mentioned, the commissioners shall, in the certificate, granted to the person claiming the land, by virtue of this act, state the existence of the adverse claims ; in which case the party shall not be entitled to a patent, unless he shall have obtained in his favor a judicial decision, in a court having jurisdiction therein."

This statute embraces precisely the kind of claims specified in the 8th section of the act of the Mississippi territory, passed in 1812, to wit: certificates issued upon warrants, orders of survey, and to donation and pre-emption claimants.    The first section provides for claims upon warrants and orders of survey ; the second, for donations to actual settlers at the time the Spanish authorities relinquished possession ; and the third, to pre-emptions in favor of residents at the time of the passage of the law.    It is reasonable, there-

fore to suppose that it was intended by the Mississippi legislature, to make the certificates, issued under this statute, evidences of legal title; and to authorise the holders of them to use them in such actions, either as plaintiffs or defendants.

It seems clear to my view, that the act of the Mississippi territory, above referred to, was mainly, or altogether intended to give these certificates the na ture of legal, in contradistinction to equitable, titles; and not further than this, to have enlarged the rights of those who held them. The language which is used, conveys this idea; for, although it is said, that such certificates "shall be taken and received, as vesting a full, complete, and legal title in the person," &c., yet this strong language is afterwards qualified by the words, "so far as to enable the holder of such certificate to maintain any action thereon," &c.

It is not necessary to inquire, whether the certificate did confer, without the statute, a legal or equitable right; it is sufficient that it was considered by the legislature, an equitable one. And the opinion that it was so considered, is confirmed when it is remembered, that one class of the certificates only, conveyed the evidence of right of possession, while the holder, who claimed by pre-emption, was punctual in meeting his engagements with the United States; and that when he failed to do so, his land was forfeited; and that another class, those expressed in the proviso to the 6th section, were intended, and made so to appear, on their face, to be made the subject of a suit, before it could be determined whether the holders would have a right to claim grants or not.

The board of commissioners were intended to act as judicial officers. With respect to the claims up-

on warrants and orders of survey, and the rights of those who claimed donations, under the second section of the act, their adjudication was final, and those in whose favor their decision was made, had a right to demand grants from the government of the United States, which could not be refused: therefore these certificates had all the effect of complete titles. But, although the certificate of him, who claimed by pre-emption, might be used as well in law as in equity, yet, if he had forfeited the land to the United States, by failing to make the necessary payments, although before such failure, he could—yet, after, he could not, sustain any action on his certificate.

In March, 1804, congress passed an act, supplementary to the act of 1803, but none of its provisions at all affect this case. Its only operation upon the kind of claims provided for in the act of 1803, was to extend the time in which they might be presented.

In April, 1812, the same year, and a few months before the passage of the act, by the Mississippi territory, making certificates evidence of legal titles, congress passed a law, entitled, "an act for ascertaining the titles and claims to lands, in that part of Louisiana which lies east of the river Mississippi, and island of New Orleans." This act required, "that every person claiming lands in the tract of country aforesaid, by virtue of any grant, order of survey, or other evidence of claim, whatsoever, derived from the French, British or Spanish governments," shall file his evidence with a commissioner, which the President was required to appoint. It made it the duty of this commissioner, to examine the evidence which should be submitted to him; make out abstracts, from the records, (he was required to keep a record of them,) of the

claims filed with him, under such instructions as the Secretary of the Treasury should transmit to him; which abstract he was required to report to the Secretary of the Treasury, to be by him laid before Congress, at its next session, thereafter, for their determination thereon.    This act did not authorise any certificate to be issued by the commissioner to be appointed under it, and no subsequent statute was passed, until after the enactment by the Mississippi legislature, of the law making certificates issued by commissioners, &c. evidence of legal title.

The next act of Congress on the subject of these claims, was passed in 1819,[a] and is entitled "an act for adjusting the claims to land, and establishing land offices in the districts east of the island of New Orleans."

> [a] L. L. 758.

By this act a land office is established at St. Helena, for the district west of Pearl river, and at Jackson court house, for the district east of that river, and the President is required to appoint a register and receiver for each office.    The act also confirms the claims to land, reported favorably on by the commissioner, who had acted under the act of 1812; and authorises claims to be filed before these officers, in the same way which had been prescribed in relation to those filed before the commissioner, by the act of 1812.    By the 9th section it is made the duty of the register "to make to the commissioner of the general land office, a report of all the claims filed with the register aforesaid, with the substance of the evidence in support thereof, &c., and also their opinion, and such remarks as they may think proper to make, &c; which report shall be laid, by the commissioner of the general land office, before congress, at their next session, for their determination thereon."

By the first section of this act, all claims to land, founded on complete grants from the Spanish government, reported to the Secretary of the Treasury by the commissioner under the act of 1812, which, in the opinion of the commissioner, were valid, are recognised as valid and complete titles. And by the 2d section, all claims reported as aforesaid, founded on any order of survey, requette, permission to settle, or any written evidence of claim, derived from the Spanish authorities, which ought, in the opinion of the commissioners, to be confirmed, are confirmed in the same manner as if the title had been completed.

By the 3d and 4th sections, the rights of persons claiming donations and pre-emptions, which have been reported favorably on by the commissioners, are recognised, and their claims confirmed.

The 12th section provides as follows: " That the books of the former commissioners, in which the claims, and evidence of claims, are recorded, shall be lodged with the registers of the land office, for the respective districts; and the register and receiver of public money, in each respective district, shall have power to examine the claims recognized, confirmed, or provided to be granted, by the provisions of this act, as also claims to the right of pre-emption; and they shall make out to each claimant entitled, in their opinion, thereto, a certificate according to the nature of the case, under such instructions as they may receive from the commissioner of the general land office; and on presentation at the general land office of such certificate for a confirmed claim, or for a donation, according to the provisions of this act; and where it shall appear, to the satisfaction of the commissioner of the general land office, that the cer-

tificate has been fairly obtained, according to the true intent and meaning of this act, then, and in that case, a patent shall be granted," &c.

Do the certificates issued under this act come within the provisions of the 8th section of the act of 1812, of the Mississippi territory? Although issued under a law of congress of subsequent date to that of the territory, if they were of the same authority, a ndstood, in every respect, in the same situation of those, authorised by previous statutes, it might be proper to consider them as coming within the operation of the territorial act; but this is not the case.— The certificates issued by the board of commissioners constituted under the act of 1802, were either complete évidences of a right of possession, or intended to enable the person in whose favor they issued, to bring before a court of justice, the validity of a conflicting pretended grant; and in the event of the grant being found invalid, gave the certificate holder the right to a patent. In fact, in all cases, except when issued to one claiming a pre-emption, or showing on their face, that there was a conflicting grant, for the same land, they were, in effect, equivalent to a grant.

But, was this the case with respect to the certificates issued under the act of 1819? Far from it.— Although the claims reported favorably on by the commissioners, were confirmed, yet it was submitted to the register and receiver, to determine what claims were intended, by the act, to be confirmed; and thereupon to issue certificates to such as they considered entitled to them; and these certificates did not entitle the holders of them to grants, but they were required to be presented to the commissioner of the

general land office, whose duty it was to determine whether they had been fairly obtained, before any grant could be demanded.

Without the act of the legislature of the Mississippi territory, would these certificates have been any evidence of title, either in law or equity? I conceive they would not; at any rate, until the commissioner of the general land office had determined that they were fairly obtained. The certificates are only evidence that the party has thus far taken the necessary steps to obtain the recognition of his claim; but are no more proof of the validity of that claim before a court of justice, than any other step which the officers of the land office might have taken on it. In proof of the correctness of this opinion, I would suppose, that if a recovery were to be had by A against B, upon a certificate, and afterwards the land was to be granted to B, would the previous recovery by A, forever bar B's right; or what effect would the grant have against A?

The estimation in which these certificates have been held by the registers and receivers themselves, may be seen from the circumstance of their having, in some instances, issued them to different persons for the same land; one such case has been before this court. In the case of *Hallet* vs. *Eslava*, both parties produced certificates upon the trial.

Although the certificate, in this instance, is expressed to have been issued under the act of congress of 1822, "confirming claims to lots in the town of Mobile," yet, it was in fact issued under the act of 1819. The act of 1822, simply confirms the claims to town lots, without prescribing the mode of obtaining grants: but it is evidently supplemental to the

act of 1819, and has so been considered; for the certificates are all issued by virtue of the provision contained in the latter act, and have to undergo the scrutiny of the commissioner of the general land office.

An examination of the acts. of 1819 and 1822, shows satisfactorily, to my mind, that the certificates issued under them, were never intended to be evidence of the slightest nature, except against the United States, and that they cannot be used in suits between holders, and other individuals, not deriving title from the United States, even if they could be used against those who claimed under the United States.

I am aware, that, in July, 1829, in the case of *Hallet* vs. *Eslava*, this court made a different decision. But that case was argued the last day of the session, and hastily decided, and should not be considered of binding authority.

It is my opinion this case should be reversed and remanded; and on the point embraced in this opinion, I dissent from the opinion of the court, delivered a few days since, in the case of *Hallet* vs. *Eslava*, which has been before us a second time.

LIPSCOMB, C. J., not sitting.